**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| DONALD ALBERT GORDON (K-64491),<br><br>　　　　Plaintiff,<br><br>　　v.<br><br>GHALIAH OBAISI, AS INDEPENDENT EXECUTOR OF THE ESTATE OF SALEH OBAISI, WEXFORD HEALTH SOURCES, INC., AND WALTER NICHOLSON,<br><br>　　　　Defendants. | No. 17-c-6629<br><br>Hon. John J. Tharp, Jr. |

## AMENDED COMPLAINT

NOW COMES Plaintiff DONALD ALBERT GORDON ("Mr. Gordon"), by and through his counsel, DLA Piper LLP (US), complaining of Defendants GHALIAH OBAISI, as independent executor of the estate of Saleh Obaisi ("Dr. Obaisi"), WEXFORD HEALTH SOURCES, INC. ("Wexford"), and WALTER NICHOLSON ("Nicholson") (collectively, "Defendants") for violation of his civil rights under 42 U.S.C. § 1983. Mr. Gordon states as follows:

### INTRODUCTION

1.　　Mr. Gordon brings this lawsuit to remedy the violations of his civil rights by the Defendants' deliberate indifference to his medical needs. This is a civil action for monetary damages and injunctive relief for Defendants' deprivation of Mr. Gordon's constitutional rights.

2.　　For many years, Defendants failed to adequately respond to Mr. Gordon's serious medical needs, which include Mr. Gordon's degenerative disc disease, metatarsophalangeal joint arthritis, failing eye sight, and chronic sinus condition. As a result, Mr. Gordon suffered great pain (and continues to suffer such pain) and his medical conditions unnecessarily worsened

while in the Defendants' care and custody as an inmate at Stateville Correctional Center ("Stateville").

3.      Defendants' failure to adequately respond to Mr. Gordon's serious medical needs constitute violations of Mr. Gordon's rights under the Eighth Amendment of the Constitution of the United States, made applicable to the states by the Fourteenth Amendment. U.S. Const. amends. VIII and XIV.  Mr. Gordon is entitled to damages and injunctive relief pursuant to 42 U.S.C. § 1983.

**JURISDICTION AND VENUE**

4.      Mr. Gordon's civil rights were violated by Defendants' actions while he was incarcerated at Stateville. This Court has jurisdiction under 28 U.S.C. §§ 1331 and 1367 and 42 U.S.C. § 1983.

5.      Injunctive relief and damages are authorized pursuant to 42 U.S.C. § 1983.

6.      The incidents that form the basis of this Amended Complaint took place in Will County, Illinois.  Venue is thus proper under 28 U.S.C. § 1391.

**THE PARTIES**

7.      Plaintiff Donald Gordon is an inmate in the custody of the Illinois Department of Corrections ("IDOC") at Stateville in Crest Hill, Illinois.  His identification number is K64491.

8.      Defendant Wexford Health Sources, Inc. is a Florida corporation registered to conduct business in Illinois.  Wexford is the contractor for the State of Illinois providing medical care to inmates at Illinois correctional institutions, including Stateville.

9.      Defendant Dr. Saleh Obaisi was, at all times relevant to the allegations against him, a licensed medical doctor and the Medical Director at Stateville.   Dr. Obaisi was responsible for providing medical care and treatment to Mr. Gordon at Stateville.   Defendant

2

Obaisi is sued in his individual capacity. Due to the death of Dr. Obaisi, Ghaliah Obaisi, as independent executor of his estate, is sued here in his stead.

10.     Defendant Walter Nicholson is an IDOC employee and the warden of Stateville Correctional Center. Warden Nicholson is being sued in his official capacity and is being sued to ensure that any injunctive relief resulting from this action is carried out. *Gonzalez v. Feinerman*, 663 F.3d 311, 315 (7th Cir. 2011).

11.     At all times relevant to this Complaint, the Defendants were acting under the color of the laws of the State of Illinois.

12.     Prior to filing this lawsuit, Mr. Gordon fully exhausted his available administrative remedies.

13.     Mr. Gordon will produce copies of the grievances he filed, letters he wrote, his medical records, etc. in discovery. Mr. Gordon has hundreds of pages of grievances, medical records, letters, and other documents to substantiate his claims related to all four medical conditions.

14.     The acts and omissions upon which this Complaint are based took place while Mr. Gordon was in the custody of IDOC.

## FACTUAL BACKGROUND

## MR. GORDON'S SERIOUS MEDICAL ISSUES

15.     For most of his time of incarceration, Mr. Gordon has suffered from several serious medical issues, all of which have caused him great pain and caused his health and quality of life to deteriorate.

16.     Mr. Gordon's suffering due to his serious medical issues has been exacerbated by Defendants' deliberate indifference to his medical needs, as demonstrated by, for example,

Dr. Obaisi's failure to grant Mr. Gordon access to medical providers, tests, medications and accommodations that could have helped quell his pain and/or prevented his medical conditions from further deteriorating.

17.     Instead of helping Mr. Gordon access the medical providers, tests, medications and accommodations that he needed, Dr. Obaisi refused to refer Mr. Gordon to appropriate medical providers, and caused Mr. Gordon more discomfort than necessary and/or caused his medical conditions to worsen by, for example, failing to timely give him a medical permit for a lower bunk, an extra pillow, orthotics, soft-sole shoes, eyeglasses, and a permit to be shackled in leather instead of metal.

18.     Defendant Wexford was deliberately indifferent to Mr. Gordon's serious medical needs, as its policies and procedures meant to promote cost-savings resulted in extraordinary delays in Mr. Gordon receiving necessary medical treatment, and negatively influenced Dr. Obaisi's decisions with regards to Mr. Gordon's medical care.

19.     As a result of the Defendants' deliberate indifference to his medical needs, Mr. Gordon's serious medical issues have worsened over time and Mr. Gordon has experienced prolonged and extreme suffering, all of which constitutes cruel and unusual punishment.

20.     Mr. Gordon's serious medical issues fall into four categories:  a back condition, a foot condition, an eye condition, and a chronic sinus condition.

## BACK PAIN

21.     Since at least 2013, Mr. Gordon has experienced daily severe and chronic pain in his back.  This pain often radiates down his buttocks, through his pelvis and hips, down his legs, and to his feet.  The pain is sometimes accompanied by leg numbness and/or uncontrollable twitching.

4

22.     During particularly bad flare-ups of pain, Mr. Gordon is unable to walk, and the slightest movement—such as sneezing or sniffling—causes him to experience shooting, excruciating pain in his back and/or lower body.  Mr. Gordon's flare-ups usually last several hours, but sometimes last for days at a time.  During this period, Mr. Gordon is essentially reduced to a paralyzed state, as the slightest movements cause him horrific pain.

23.     In addition to physical pain, Mr. Gordon's back condition causes him extreme mental and emotional distress.  He is often forced to lay in unnatural positions or on his filthy cell floor to try and alleviate his pain.  He regularly loses hours of sleep due to the pain (causing chronic exhaustion), and he can do very little physical activity or even light sedentary activities.

24.     In 2013, after Mr. Gordon started suffering from the back pain, he sought medical treatment and help from anyone who would listen.  Among others, Mr. Gordon presented his pain to Dr. Obaisi, and requested that Dr. Obaisi refer him to an outside specialist, as there was no appropriate orthopedic doctor at Stateville.

25.     Rather than refer Mr. Gordon to an orthopedist, Dr. Obaisi told Mr. Gordon that he would receive medical treatment at Stateville.  When Dr. Obaisi made this medical determination, he was aware that there was no appropriate orthopedic doctor at Stateville.

26.     After insisting that Mr. Gordon be treated "in house", Dr. Obaisi delayed Mr. Gordon's treatment at every turn.

27.     For example, Dr. Obaisi did not order a simple x-ray of Mr. Gordon's back for roughly four months.  During this time, Mr. Gordon's appointments with Dr. Obaisi and other Stateville medical staff were often cancelled with no explanation.

28.     After months of delays, Mr. Gordon's back was finally x-rayed in late 2013. The x-ray revealed that Mr. Gordon suffers from degenerative disc disease and bone spurring.

5

29.     Degenerative disc disease is a condition that occurs when one or more of the discs between the vertebrae of the spinal column deteriorates or breaks down, leading to pain.

30.     The discomfort associated with degenerative disc disease can be debilitating.  It can lead to osteoarthritis, with pain and stiffness in the back.  It can also cause discomfort in the buttocks and upper thighs.  Tingling and numbness in the legs or feet is also common.

31.     Treatment for degenerative disc disease includes occupational therapy, physical therapy, special exercises, medications, surgery and joint injections.

32.     For patients who do not respond to conservative therapies within a few months, surgery is often recommended.  Surgery is an especially important option for people whose pain stops them from carrying out regular activities; those who have numbness or weakness in the legs; and those who have a difficult time standing or walking.

33.     While disc degeneration may cause no symptoms in some people, for others the pain may be so intense that the individual cannot continue with their daily activities.

34.     Unfortunately for Mr. Gordon, he experiences severe pain in his back, hips, buttocks, legs, and feet stemming from his degenerative disc disease.  This pain often interferes with his ability to walk, sit, stand, exercise, or sleep comfortably.

35.     Following his x-ray, Mr. Gordon continued to seek treatment for his degenerative disc disease.  From late 2013 onwards, Mr. Gordon repeatedly asked Dr. Obaisi and other Stateville medical staff to see an outside specialist who could help further diagnose him and help him manage his pain and condition.

36.     Despite the fact that Mr. Gordon's degenerative disc disease and x-ray demonstrated that he needed further medical attention from a specialist, for the next *two years*,

6

Dr. Obaisi only offered Mr. Gordon physical therapy and over-the-counter medications—both of which did nothing to curb Mr. Gordon's pain.

37.     Dr. Obaisi did not listen to Mr. Gordon's pleas for an offsite medical referral. Instead, Dr. Obaisi persisted in his ineffective treatment of Mr. Gordon and refused to refer Mr. Gordon to a qualified specialist.

38.     Dr. Obaisi often told Mr. Gordon that he was "too expensive" and that he was "fine."

39.     On information and belief, Dr. Obaisi's comments and lack of treatment stemmed from Wexford's policies and procedures which encouraged Stateville medical staff to do as little as possible in order to save money.

40.     Throughout 2014 and 2015, Mr. Gordon continued to plead with Dr. Obaisi to refer him to a specialist.  After two years of ignoring Mr. Gordon's pain and cries for help, Dr. Obaisi finally permitted Mr. Gordon to see a specialist.

41.     When Mr. Gordon met with an orthopedic specialist at the UIC pain clinic on approximately December 8, 2015, the specialist told Mr. Gordon that his x-ray and presentations "obviously" warranted an MRI of Mr. Gordon's spine.  In other words, it should have been obvious to Dr. Obaisi in 2013 that Mr. Gordon needed further treatment and diagnosis.

42.     The specialist's comments verified, as Mr. Gordon already knew, that his disc disease was serious and should not have been ignored for two years.

43.     Mr. Gordon had an MRI conducted on approximately January 15, 2016.  The MRI revealed that Mr. Gordon's spine and back were in horrific condition.  Mr. Gordon had several bulging or degenerated discs, among other issues.

7

44.    As a result of the MRI, which verified the immense pain that Mr. Gordon was in, Mr. Gordon received an epidural injection.  The orthopedic specialist also recommended that Mr. Gordon sleep on a bottom bunk, refrain from impact activities, and sleep utilizing an additional pillow to help alleviate pain.  The specialist instructed Mr. Gordon to return if his condition did not improve.

45.    Despite these recommendations from the specialist, Dr. Obaisi did not issue Mr. Gordon an extra pillow or a medical permit for a bottom bunk until October 2016—roughly ten months after the specialist had recommended the same.

46.    During this ten month period, Mr. Gordon was forced to sleep on the floor of his prison cell whenever he was experiencing a flare-up of pain.  Mr. Gordon spent months (cumulatively) sleeping on the floor of his cell because he either could not reach his top bunk bed, or he avoided jumping up to his bed because the jumping intensely aggravated his back and foot pain (there is no ladder on Stateville's bunk beds).

47.    Similarly, Dr. Obaisi refused to issue Mr. Gordon a medical permit allowing him to be shackled with leather straps rather than metal handcuffs.  Mr. Gordon repeatedly asked Dr. Obaisi for this medical permit because metal handcuffs cause him great discomfort in his back.  Mr. Gordon is often transported (for example, to court).  The metal shackling digs into his sensitive back and needlessly puts Mr. Gordon in excruciating pain for hours at a time.

48.    By failing to issue Mr. Gordon medical permits related to these simple things (a lower bunk, an extra pillow and leather straps) despite the specialist's recommendation, Dr. Obaisi demonstrated his deliberate indifference to Mr. Gordon's serious medical needs and constitutional rights.

8

49.     When Mr. Gordon was still experiencing back pain in late 2016, his orthopedic specialist prescribed Mr. Gordon painkillers and told Mr. Gordon to let him know if the medications and dosages were effective. Mr. Gordon took the prescriptions for several months, but eventually concluded that the doses were insufficient to control his pain. When Mr. Gordon informed Dr. Obaisi that the current doses did not alleviate his pain, Dr. Obaisi told him that he was "not going to deal with [Mr. Gordon's] back issues today" and refused to discuss the medications and dosages.

50.     In July of 2017, Mr. Gordon was allowed to return to the UIC pain clinic and see the orthopedic specialist. At this appointment, the specialist informed Mr. Gordon that his condition had worsened and ordered another MRI. The specialist also agreed that Mr. Gordon's pain medication dosage should be increased and ordered another spinal injection. The specialist noted that surgery might be necessary because Mr. Gordon had "serious back and hip issues." The specialist requested that Mr. Gordon come back in one month.

51.     Shortly after Mr. Gordon's appointment with the specialist, Mr. Gordon saw Dr. Obaisi who told Mr. Gordon that he was not going to increase his pain medication dosage until he felt like it, which "wasn't today." Dr. Obaisi also told Mr. Gordon that he would not be going back to the specialist in a month because Mr. Gordon was "fine" and Dr. Obaisi "wasn't going to spend any more money on this." Dr. Obaisi said that if Mr. Gordon had any more complaints related to his back, he should sign up for sick call.

52.     Dr. Obaisi never arranged for Mr. Gordon to see the specialist again.

53.     Mr. Gordon remains in severe and nearly constant back pain.

## FOOT CONDITION

54. Mr. Gordon has suffered from severe pain in his right foot since approximately 2005. The pain is primarily located in his metatarsophalangeal joints and results in pain when walking, running, or standing, and even when his foot is touched.

55. The metatarsophalangeal joints are the joints between the metatarsal bones of the foot and the proximal bones of the toes. Metatarsophalangeal joint pain most commonly results from misalignment of the joint surfaces with altered foot biomechanics, causing joint subluxations, flexor plate tears, capsular impingement, and joint cartilage destruction (osteoarthrosis).

56. Symptoms and signs include pain with walking and tenderness. Treatment includes orthotics, local injection, and surgery.

57. In 2005, Mr. Gordon's foot condition was diagnosed by a podiatrist. The podiatrist fitted Mr. Gordon with custom-made orthotics and instructed Mr. Gordon to wear soft-sole shoes. These simple treatments greatly alleviated Mr. Gordon's pain and allowed him to participate in activities such as gym time.

58. However, Mr. Gordon's orthotics were eventually confiscated by the IDOC, who deemed the insoles a threat to security. Mr. Gordon immediately began filing grievances related to his orthotics, seeking to have them replaced. Without them, Mr. Gordon had a difficult time walking and experienced horrible pain when he tried to jump onto his top bunk.

59. In approximately April 2014, Mr. Gordon saw Dr. Obaisi regarding his foot pain. At this meeting, Mr. Gordon advised Dr. Obaisi of his extreme foot pain and noted that the pain was worse now that Mr. Gordon did not have orthotics. Mr. Gordon asked Dr. Obaisi to refer him to a podiatrist, and also asked Dr. Obaisi to prescribe him orthotics and soft-sole shoes.

10

60.    Dr. Obaisi responded that he could not prescribe the orthotics due to security concerns and that it would "cost too much for [Mr. Gordon] to see a podiatrist." Dr. Obaisi also told Mr. Gordon that he should buy his desired shoes from the prison commissary. When Mr. Gordon advised Dr. Obaisi that he did not have the funds to purchase shoes from the commissary, Dr. Obaisi said "then you should just take some aspirin or ibuprofen."

61.    For the next several months, Dr. Obaisi continued to deny Mr. Gordon any treatment or pain management for his foot, and told Mr. Gordon that his "condition is not painful" and asked Mr. Gordon "what kind of treatment do you expect in prison?"

62.    During this time, Mr. Gordon was having trouble walking due to pain, his foot was extremely tender to the touch, and Mr. Gordon experienced great pain when jumping to his top bunk bed. Mr. Gordon repeatedly sought help from Dr. Obaisi, but Dr. Obaisi did not listen to Mr. Gordon's pleas for orthotics, soft-sole shoes, and an offsite medical referral. Instead, Dr. Obaisi persisted in his ineffective treatment of Mr. Gordon and refused to refer Mr. Gordon to a qualified specialist.

63.    Finally, in February 2015, Dr. Obaisi ordered an x-ray of Mr. Gordon's foot. The x-ray demonstrated that Mr. Gordon had degenerative joint disease in his metatarsophalangeal joints.

64.    Despite this diagnosis, Dr. Obaisi did not follow up with Mr. Gordon. When Mr. Gordon was granted an appointment with Dr. Obaisi, Dr. Obaisi often cancelled Mr. Gordon's appointment with no explanation.

65.    In approximately June 2015—months after the x-ray was taken—Dr. Obaisi saw Mr. Gordon and acknowledged that Mr. Gordon's foot was arthritic and agreed to grant Mr. Gordon a medical permit for a soft-sole shoe. At that appointment, and in subsequent

11

appointments, Dr. Obaisi continued to reject Mr. Gordon's pleas to see a podiatrist and his requests for orthotics.

66.     When Mr. Gordon received the soft-sole shoes, the shoes were tight across his metatarsophalangeal joints and thus caused him great pain. Mr. Gordon advised Dr. Obaisi of this issue and of his continued pain. Dr. Obaisi continued to refuse Mr. Gordon a podiatrist appointment and told him that he could do nothing more for Mr. Gordon with regards to his foot. Dr. Obaisi did not help Mr. Gordon acquire a pair of soft-sole shoes that fit his foot.

67.     In April 2016, Mr. Gordon's continued pain and lack of care from Dr. Obaisi caused him to write grievances and letters to several people, including the IDOC medical director, the Chairman of Wexford Health Services, and many others. Mr. Gordon received no response to his letters.

68.     Throughout the remainder of 2016, Dr. Obaisi continued to cancel Mr. Gordon's appointments or would tell Mr. Gordon that he just needed to "be careful" when walking and getting up into his top bunk bed. Dr. Obaisi refused to treat Mr. Gordon or to send him to a podiatrist.

69.     On more than one occasion, Dr. Obaisi told Mr. Gordon that he "needed to stop costing so much money" and that "so long as you can walk, it is not an emergency no matter how debilitating." Dr. Obaisi also told Mr. Gordon on several occasions that he "d[id] not have time to deal with [Mr. Gordon's] foot issue."

70.     Dr. Obaisi's lack of treatment and deliberate indifference to Mr. Gordon's pain continued throughout the early part of 2017. Dr. Obaisi continued to refuse to send Mr. Gordon to a podiatrist, and told Mr. Gordon that only diabetic inmates could have shoe modifications.

71.    In May 2017, when Mr. Gordon was being seen at the UIC pain clininc for his back condition, his orthopedist observed Mr. Gordon's enlarged joint on his first toe.  The doctor immediately took an x-ray of Mr. Gordon's foot and told him that he was suffering from severe arthritis of the metatarsophalangeal joint.   This prompted Mr. Gordon's orthopedist to recommend to Dr. Obaisi that Mr. Gordon see a podiatrist for his foot.

72.    Despite the orthopedist's recommendation, Dr. Obaisi still did not refer Mr. Gordon to a podiatrist.  Each time Dr. Obaisi saw Mr. Gordon, he told him that he would deal with Mr. Gordon's foot issue "later."

73.    On information and belief, Dr. Obaisi's lack of treatment stemmed from Wexford's policies and procedures which encouraged Stateville medical staff to do as little as possible in order to save money.

74.    Eventually, Mr. Gordon was allowed to see a podiatrist.  By the time he saw the podiatrist, his foot arthritis and metatarsophalangeal joint issues had deteriorated to the point that Mr. Gordon permanently walks with an altered gait and potentially needs surgery.  The podiatrist informed Mr. Gordon that his foot condition worsened because he was not given soft-sole shoes and orthotics and because he was not treated earlier.  The podiatrist also told Mr. Gordon that he may no longer be a good candidate for surgery because so much time has passed and his foot condition has greatly deteriorated.

75.    Mr. Gordon is currently awaiting his surgery consultation appointment.

76.    Mr. Gordon continues to suffer pain and emotional distress as a result of his untreated foot condition.

### EYE CONDITION

77.    Mr. Gordon suffers from astigmatism in his eye.

13

78.     Astigmatism is a condition of the eye or lens where rays of light from a single point do not focus upon on a single point on the retina.  Astigmatism symptoms may include blurry vision or areas of distorted vision, eyestrain, headaches and eye discomfort.

79.     In 2014, an eye doctor prescribed Mr. Gordon prescription eyeglasses and instructed him to have a yearly eye exam to monitor his eye condition.

80.     In approximately April 2015, Mr. Gordon was due for his annual eye exam. However, Mr. Gordon was never taken for his eye exam.

81.     When Mr. Gordon inquired with medical staff about the exam, the staff erroneously advised him that he was not due for an eye exam until August 2015.

82.     August 2015 came and went, yet Mr. Gordon still did not receive his eye exam.

83.     After many missed eye appointments, Mr. Gordon began filing grievances related to his eye treatment (or lack thereof).

84.     Eventually, Mr. Gordon was informed that there was no eye doctor at Stateville at the time to see him.

85.     Because there was no eye doctor at Stateville, inmates were being sent off-site for their optometry needs.  However, Mr. Gordon was denied an off-site optometrist appointment.

86.     In approximately September or October 2015, IDOC security staff misplaced Mr. Gordon's only pair of eyeglasses.  Security was not able to locate the eyeglasses again.

87.     Without his eyeglasses, Mr. Gordon was unable to read or focus on letters for more than 10 to 20 minutes before he began to suffer from unbearable headaches and eyestrain. Accordingly, Mr. Gordon could not read or write for an extended period of time.  This interfered with his ability to, among other things, keep up with his criminal case appeal and communicate with friends and family.

14

88. For over a year—from approximately September or October 2015 through December 2016—Mr. Gordon submitted weekly requests (verbal complaints, grievances and correspondence) related to his eyeglasses and his need for an eye exam.

89. In these complaints, Mr. Gordon chronicled the pain his eyes were causing him in the form of headaches and eyestrain. Mr. Gordon rarely received a response to his complaints.

90. When Mr. Gordon did receive a response, he was simply told that there were no eye doctors to see him.

91. In September 2016, Dr. Obaisi told Mr. Gordon that he would not be sent off-site to an eye doctor, even though other inmates were being sent, because Mr. Gordon's "so called suffering is most likely just due to no eyeglasses." Dr. Obaisi told Mr. Gordon to stop reading.

92. Dr. Obaisi saw Mr. Gordon regarding his eye condition throughout the end of 2016. Dr. Obaisi continued to refuse to send Mr. Gordon to an external eye doctor and never helped Mr. Gordon obtain eyeglasses. Dr. Obaisi failed to take action, knowing that being without eyeglasses caused Mr. Gordon to have severe headaches and impaired his ability to read.

93. Dr. Obaisi, as a doctor, also knew or should have known, that it was imperative that Mr. Gordon receive yearly eye exams to ensure that his astigmatism and eye condition did not further deteriorate.

94. The failure to provide these services to Mr. Gordon put him at serious risk of various diseases related to the eyes—e.g., cataracts or glaucoma. Indeed, Mr. Gordon's eye health declined during the period that he was denied eye care.

95. The pain caused by the lack of reading glasses and subsequent headaches has caused Mr. Gordon to skip meals, outdoor exercise time and physical therapy, and has interfered

15

with Mr. Gordon's writing and reading. These conditions have also caused Mr. Gordon extreme frustration and mental and emotional distress.

96.     Mr. Gordon finally received his eye exam in December 2016.

97.     The doctor who conducted the eye exam advised Mr. Gordon that his astigmatism had worsened significantly since his last eye exam in April of 2014, and that Mr. Gordon needed a new prescription in order to manage his deteriorated vision.

98.     In all, Wexford and Dr. Obaisi failed to provide Mr. Gordon access to needed optometry services for approximately two years. For approximately 17 months of that period, Mr. Gordon needed, but was denied, eyeglasses. Optometry services were provided to other inmates during this time but not to Mr. Gordon.

99.     On information and belief, Dr. Obaisi's lack of treatment stemmed from Wexford's policies and procedures which encouraged Stateville medical staff to do as little as possible in order to save money.

## SINUS CONDITION

100.    Since approximately October 2015, Mr. Gordon has experienced chronic headaches and sinus issues.

101.    Mr. Gordon's face, head, nose and sinuses are consistently swollen, congested or dripping.

102.    Related to these issues, Mr. Gordon suffers from headaches on almost a daily basis. At times, the severity of his headache is so great that Mr. Gordon experiences radiating pain in his face and nasal area.

16

103.    Upon information and belief, the headaches are residual ailments stemming from an incident in October 2015 when, forced to sleep on the floor due to his back and foot pain, a cockroach, or a similar insect, bit Mr. Gordon, and caused his nose and ears to swell up.

104.    After Mr. Gordon was bit by the cockroach, a doctor diagnosed his swollen nose and ears as infected.

105.    Although the infection and related discharge and swelling eventually subsided with antibiotics, Mr. Gordon has suffered from a chronic sinus condition ever since the cockroach incident.

106.    Mr. Gordon has sought relief from his chronic sinus condition for years. Mr. Gordon has presented his condition and symptoms at countless sick calls and doctor appointments.  Mr. Gordon has consistently and periodically pleaded with Dr. Obaisi to help him find treatment for his sinus condition.

107.    For example, on approximately December 14, 2015, Mr. Gordon presented his condition and complaints to Dr. Obaisi.   At this time, Dr. Obaisi diagnosed Mr. Gordon's condition as "chronic rhinitis."

108.    Rhinitis is commonly known as hay fever, and is inflammation of the nose.

109.    Symptoms of rhinitis include runny nose, nasal itching, nasal congestion and sneezing.  One of the most common characteristics of chronic rhinitis is post-nasal drip, which is mucus accumulation in the back of the nose and throat that drips downward from the back of the nose.  Post-nasal drip can cause sore throat, cough or throat clearing.

110.    Other allergic symptoms include:  itchy ears and throat, red or watery eyes, cough, fatigue, lack of energy from loss of sleep, headaches and facial tenderness.

17

111.    Treatment for rhinitis includes avoiding allergens, medications (both over-the-counter and prescription), and irrigating the nasal passages.  Surgery can be used to correct any structural issues in the sinuses that may be causing the symptoms.

112.    A significant association exists between rhinitis (allergic), asthma and chronic sinusitis (inflammation of the sinuses for more than 12 weeks) in some individuals.

113.    Dr. Obaisi instructed Mr. Gordon to take various over-the-counter and prescription medications over the next two years.  However, none of the medications that Dr. Obaisi instructed Mr. Gordon to take were effective.  Mr. Gordon told Dr. Obaisi that the medications were ineffective.

114.    During this time Mr. Gordon pleaded with the medical staff, and specifically Dr. Obaisi, to allow him to see an immunologist (allergist).

115.    Dr. Obaisi did not listen to Mr. Gordon's pleas for an offsite medical referral. Instead, Dr. Obaisi persisted in his ineffective treatment of Mr. Gordon and refused to refer Mr. Gordon to a qualified specialist.

116.    In denying Mr. Gordon adequate medical care, Dr. Obaisi stated that Mr. Gordon "cost too much to treat" and that Mr. Gordon should just "live with" his condition.

117.    Dr. Obaisi would not even grant Mr. Gordon's request for an extra roll of toilet paper to use to clean up his leaking sinuses.  According to Dr. Obaisi, he could not issue the permit because allowing Mr. Gordon an extra roll of toilet paper posed security concerns.

118.    When Mr. Gordon asked other prison officials about the reason for the toilet paper denial they were unaware that extra toilet paper constituted a security concern.

18

119.     In addition to the pain Mr. Gordon suffers related to his untreated sinus condition, Mr. Gordon has lost his smell of certain things, his ears "ring" on a regular basis, and his nasal passages are extremely sensitive to cold weather and often go numb in such weather.

120.     Mr. Gordon's sinus condition is so severe that it interrupts his sleep and causes him pain when prone.  When laying down, Mr. Gordon suffers from nasal and facial swelling and congestion.  He often awakes, gasping for air and sometimes choking.  Mr. Gordon is never able to sleep for more than a few hours at a time before he is awoken due to his sinus condition.  As a result, Mr. Gordon is in a constant state of fatigue and sleep deprivation.

121.     Mr. Gordon's troubles do not end with his sleep.  Each morning, Mr. Gordon must try to clear his sinuses by spitting out the mucus and violently blowing his nose.  But, blowing his nose is fruitless, as nothing comes out, and the effort of trying to clear his nose only exacerbates his headaches and facial pain.

122.     As a result of the constant discharge, Mr. Gordon's quality of life is suffering. People avoid Mr. Gordon (both staff and other inmates), and Mr. Gordon is unable to have immediate access to soap and water, which means that he often has contaminated hands and/or "snot rags", and people do not want to be near him.

123.     Mr. Gordon's sinus condition also interferes with his ability to see, as wearing his eyeglasses when his face is swollen is painful and interferes with his ability to breathe (Mr. Gordon's eyeglasses pinch the top of his nose when his face is swollen, partially or completely restricting his nasal airwaves).  As a result, Mr. Gordon often cannot wear his glasses and therefore cannot see, read or focus.

124.     Mr. Gordon continues to suffer from debilitating sinuses to this day.  He has not seen an allergist.

125.    On information and belief, Dr. Obaisi's lack of treatment stemmed from Wexford's policies and procedures which encouraged Stateville medical staff to do as little as possible in order to save money.

## DEFENDANT OBAISI

126.    Up until his death, Defendant Dr. Obaisi was the Medical Director at Stateville.

127.    Dr. Obaisi was ultimately responsible for all health care delivered by Defendant Wexford at Stateville, for ensuring timely and efficient responses to inmates' healthcare needs and for carrying out Wexford's policies and procedures.

128.    Dr. Obaisi was charged with coordinating the services of physicians, physician extenders (e.g., physician assistants, nurse practitioners, etc.), dentists, psychiatrists, psychologists, registered nurses and any other medical professionals working within the medical facilities at Stateville.

129.    Dr. Obaisi was responsible for providing direct patient care to ensure timeliness and implementation of appropriate medical care and for resolving problems related to patient safety issues and patient complaints and grievances.

130.    Dr. Obaisi was charged with ensuring that established sick call processes ensure patient access to medically necessary services.

131.    Dr. Obaisi failed to uphold his duties with respect to Mr. Gordon.

132.    Mr. Gordon repeatedly asked Dr. Obaisi for medical care and treatment for his serious medical conditions and also informed Dr. Obaisi that he was being denied access to adequate medical care and treatment.

133.    In addition to Mr. Gordon's conversations with Dr. Obaisi, Dr. Obaisi learned of such requests and denials in numerous grievances and letters tendered to him and Stateville

20

officials. From these communications, Defendant Obaisi had knowledge of Mr. Gordon's serious medical conditions and lack of access to medical care, yet Defendant Obaisi failed to do anything to rectify the situation and adequately address Mr. Gordon's serious medical needs.

## DEFENDANT NICHOLSON

134. Walter Nicholson is the Warden of Stateville. He is sued in his official capacity.

135. Nicholson is responsible for ensuring that any injunctive relief granted in this action is carried out.

## DEFENDANT WEXFORD

136. In or about 2011, the State of Illinois awarded Defendant Wexford a contract valued in excess of $1 billion to provide medical care to inmates in every prison operated by IDOC.

137. Defendant Wexford's contract with Illinois provides for, in essence, a flat payment based on the inmate population. Defendant Wexford thus has an economic incentive to provide minimal medical care to inmates.

138. At all times relevant to this Complaint, Defendant Wexford maintained a policy, procedure or practice at Stateville under which inmates with serious medical conditions, such as Mr. Gordon, were denied timely access to adequate medical care as a means of reducing costs spent on medical treatment for inmates at Stateville. As a result, Defendant Wexford's provision of healthcare services at Stateville has fallen below constitutional standards.

139. Defendant Wexford's cost-cutting measures and subsequent failure to provide constitutionally adequate healthcare have been well-documented.

140. On December 19, 2013, pursuant to Rule 706 of the Federal Rules of Evidence, the Court appointed Dr. Ronald Shansky as a court-appointed expert in the case currently pending in

the United States District Court for the Northern District of Illinois captioned *Lippert v. Ghosh*, No. 1:10-cv-04603, in order to "assist the Court in determining whether [IDOC] is providing health care services to the offenders in its custody that meet the minimum constitutional standards of adequacy." *Lippert v. Ghosh*, No. 1:10-cv-04603, Dkt. #244 at ¶ 1a.

141.     The Court instructed Dr. Shansky to "investigate all relevant components of the health care system except for programs, services and protocols that relate exclusively to mental health," and directed the expert to "review IDOC policies, procedures and forms related to the provision of health care at its correctional facilities." *Id.* at ¶¶ 1a, 4a. The Court recommended that Dr. Shansky conduct a site visit at Stateville as part of its investigation. *Id.* at ¶ 4d.

142.     In December 2014, Dr. Shansky issued his final report (the "Final Expert Report"). The Final Expert Report concludes that "the State of Illinois has been unable to meet minimal constitutional standards with regards to the adequacy of its health care program for the population it serves." Final Expert Report, at p. 45. The Final Expert Report identifies numerous critical deficiencies by Defendant Wexford that contribute to poor healthcare services for inmates across Illinois prisons, including at Stateville. On information and belief, those critical deficiencies continue to this day.

143.     According to the Final Expert Report, there is a "major problem with access to care" at Stateville. Patient appointments and clinics are "frequently cancelled" due, in part, to Defendant Wexford's inadequate staffing. Defendant Wexford's inadequate staffing contributes to "substantial delays [in treatment] and sometimes [inmates' medical] problems not ever being addressed." See *Id.* at 50-52.

144.     The Final Expert Report also found that Defendant Wexford hires clinicians who are underqualified to practice the type of medicine required of the position, and its medical staff "receive no specialized training and are not provided with guidelines." *See id.* at pp. 7-8.

145.     In 2013, the John Howard Association of Illinois (the "JHA") issued a report regarding the JHA's monitoring visit to Stateville. (JHA Monitoring Visit to Stateville Correctional Center 2013 (the "JHA Report").)  As set forth therein, and summarized here, the JHA Report identifies several critical deficiencies by Defendant Wexford that contribute to poor healthcare services for inmates at Stateville.  On information and belief, those critical deficiencies continue to this day.

146.     According to the JHA Report, medical staff at Stateville "are discouraged by Wexford administrators from ordering certain medications and supplies due to cost."  As a result, the JHA Report concluded that Stateville inmates are denied appropriate and necessary medical supplies.  *See* JHA Report, at p. 8.

147.     The delayed and inadequate medical care that Mr. Gordon experienced was a direct result of Defendant Wexford's policies, procedures or practices of failing to adequately train its employees, appropriately staff its healthcare units, and cutting costs that were observed in the Final Expert Report and JHA Report.

148.     On information and belief, Defendant Wexford utilizes UIC as its preferred offsite medical provider in order to reduce costs.

149.     Defendant Wexford's cost-saving measures in referring patients to offsite medical services result in "extraordinary delays" in patients receiving necessary medical treatment. Defendant Wexford's process results in "breakdowns in almost every area, starting with delays in identification of the need for the offsite services, delays in obtaining an authorization number [for

23

offsite medical services], delays in being able to schedule an appointment timely, delays in obtaining offsite paperwork and delays or the absence of any follow-up visit with the patient." *Id.*

150.    Defendant Wexford's cost-cutting policies and practices have prompted other inmates to file suits alleging delayed or inadequate medical treatment as a consequence of Defendant Wexford's policies or practices. Several such suits have been brought recently against Defendant Wexford in the Northern District of Illinois. *Harper v. Wexford Health Sources Inc.*, No. 14-CV-04879, 2017 WL 2672299, at *3 (N.D. Ill. June 21, 2017) ("Harper alleges Wexford's policy of cost-cutting has prevented him from receiving adequate and timely medical treatment, in willful indifference or disregard to his acute pain and suffering"); *Smith v. Wexford Health Sources, Inc.*, No. 16 C 3437, 2016 WL 7116586, at *2 (N.D. Ill. Dec. 7, 2016) ("As such, Plaintiff alleges that the physicians who work on behalf of Wexford and under the direction of Dr. Obaisi have been deliberately indifferent to his medical needs as part of a policy and practice designed to reduce medical costs."); *Liebech v. Hardy*, No. 11 C 5624, 2013 WL 4476132, at *6 (N.D. Ill. Aug. 19, 2013) ("Plaintiff alleges that Wexford has in place a policy that required its employees to deny medical care due to budgetary constraints . . ."); *McDonald v. Wexford Health Sources*, No. 09 C 4196, 2010 WL 3034529, at *3 (N.D. Ill. July 30, 2010) ("Plaintiff's allegation as to Defendant Wexford is that it instituted a custom and policy of cost cutting measures.").

151.    The delayed and inadequate medical care that Mr. Gordon experienced was a direct result of a policy, procedure or practice of cost cutting implemented by Defendant Wexford in the Illinois prison system, including at Stateville.

152.    But for these cost-cutting measures imposed by Defendant Wexford, Mr. Gordon's serious medical needs would have been addressed and treated more quickly at

Stateville.   Similarly, but for these cost-cutting measures imposed by Defendant Wexford, Mr. Gordon would have been sent out for outside consultations in a timely manner, leading to Mr. Gordon receiving timely and adequate medical care for his serious medical conditions.

153.    Defendant Wexford's policies, procedures or practices at Stateville resulted in the frequent failure to provide inmates, such as Mr. Gordon, with essential medical treatment despite the fact that Defendant Wexford knew that the inmates suffered from serious medical conditions.

154.    Defendant Wexford's policies, procedures or practices at Stateville are so prevalent and widespread at Stateville as to put Defendant Wexford and its policymakers on actual and applied notice that such policies existed in full force and effect.

155.    As a direct and proximate result of the unconstitutional policies, procedures and practices of Defendant Wexford, Mr. Gordon was deprived of his right to receive adequate medical care and was forced to endure months of unnecessary and unreasonable pain and suffering.

### Count I:  § 1983 Claim for Inadequate Access to Medical Care and Deliberate Indifference to Mr. Gordon's Serious Medical Conditions
(Against All Defendants)

156.    Mr. Gordon re-alleges and incorporates by reference Paragraphs 1 through 155 of this Amended Complaint.

157.    Pursuant to 42 U.S.C. § 1983, based on the Eighth Amendment, Mr. Gordon has a right to adequate access to medical care.

158.    Defendants have deprived Mr. Gordon of access to adequate medical care in violation of his Eighth Amendment rights.

25

159.    Defendants failed to adequately address Mr. Gordon's countless requests for medical care and Mr. Gordon's pain and suffering, all of which would indicate to any medical practitioner, as well as any layperson, that he was in distress and required medical care.

160.    Defendants were aware of Mr. Gordon's serious medical conditions, through Mr. Gordon's grievances, communications from Mr. Gordon, encounters with Mr. Gordon wherein his deteriorating and/or painful physical conditions were on display, and/or through seeing Mr. Gordon for medical treatment.

161.    Defendants knew or should have known that Mr. Gordon's serious medical conditions presented (and present) a substantial risk of serious harm to his health.

162.    By denying Mr. Gordon access to adequate medical care, Defendants acted with deliberate indifference, causing him to suffer harm.

163.    The denial of Mr. Gordon's access to medical care was caused, at least in part, by Wexford's policy or practice of delaying or refusing necessary medical care as a means of reducing costs, and Dr. Obaisi's refusal to approve Mr. Gordon's pleas for outside specialist treatment.

164.    But for Defendant's failure to provide Mr. Gordon with access to adequate medical care, Mr. Gordon's deteriorated medical condition, along with his unreasonable and continuing pain, suffering and emotional distress could have been avoided.

165.    Defendants' conduct was willful, wanton, malicious and in reckless disregard of Mr. Gordon's rights under the Eighth Amendment.

166.    Mr. Gordon has been harmed as a result of Defendants' conduct.

26

167.    Mr. Gordon seeks actual and punitive damages for the Defendants' violation of his constitutional rights.   Mr. Gordon also seeks injunctive relief in the form of ordering Defendants to provide him with adequate medical care.

## JURY DEMAND

168.    Mr. Gordon demands a trial by jury.

## REQUEST FOR RELIEF

WHEREFORE, Mr. Gordon requests that this Court enter judgment against the Defendants for violating his constitutional rights under the Eighth Amendment and award the following relief:

a.    Order Defendants to provide Mr. Gordon with access to adequate medical care, including but not limited to, access to outside specialists related to his back, eye, foot and sinus conditions, regular eye exams, eyeglasses, soft-sole shoes, and orthotics;

b.    Compensatory damages to compensate Mr. Gordon for his pain and suffering in an amount to be determined at trial, jointly and severally against all Defendants;

c.    Punitive damages in an amount to be determined at trial, jointly and severally against all Defendants;

d.    An award of costs and reasonable attorneys' fees pursuant to 42 U.S.C. § 1988; and

e.    Any other relief that this Court deems proper.

27

Dated: September 26, 2018               Respectfully submitted,

                                            DONALD GORDON

                                            By:     */s/ Mary M. Shepro*
                                                      One of the Plaintiff's attorneys

                                            Matthew Klepper
                                            Mary Shepro
                                            DLA Piper LLP (US)
                                            444 West Lake Street, Suite 900
                                            Chicago, Illinois 60606
                                            T 312.368.4000
                                            E matthew.klepper@dlapiper.com
                                            E mary.shepro@dlapiper.com

28

## CERTIFICATE OF SERVICE

I hereby certify that on September 26, 2018, I electronically filed the foregoing Amended Complaint with the Clerk of the Court for Northern District of Illinois, using the electronic case filing system of the court. The electronic case filing system sent a "Notice of E-Filing" to the attorneys of record in this case.

s/ *Mary M. Shepro*
One of the Plaintiff's
attorneys

29